**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 14-cv-00421-MSK

MAURICE WILSON,

      Plaintiff,

v.

DONALD WILCOX,
KEVIN LITVAN,
PATRICK O'SHAUGHNESSY,
BRIAN NAVARETTE,
JOSEPH MORABITO,
CODY HAGANS,
DOUG CULLISON,
JOSE DELGADO,
MICHAEL TERSKA, and
TERESA NEHLS,

      Defendants.

---

### OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Summary Judgment **(# 163)**, Mr. Wilson's amended response **(# 167)**, and the Defendants' reply **(# 169)**. Also pending are two motions for leave to restrict access to certain documents — one filed by the Defendants **(# 165)** and one filed by Mr. Wilson **(# 168)**.

### FACTS

The Court summarizes the pertinent facts herein, elaborating as necessary in its analysis.[1]

---

[1]     Mr. Wilson filed this action *pro se*, however, counsel was appointed for Mr. Wilson in June 2016. Unless otherwise noted, the Court derives the factual discussions herein from the Mr. Wilson's version of events and construes the evidence most favorably to him for purposes of this motion. The record evidence is comprised of: videos recording of the use of force incident

At the times pertinent to this matter, Mr. Wilson was a prisoner in the custody of the Bureau of Prisons ("BOP"), assigned to the United States Penitentiary Florence ("USP Florence") in Florence, Colorado. **(# 163-2 at 2-3, # 163-2 at 29)**. On November 2, 2013, Mr. Wilson was housed in USP Florence's Special Management Unit ("SMU") **(# 163-2 at 29)**, which is designed to house inmates who "present unique security and management concerns" requiring "greater management" of the inmate's interaction "to ensure the safety, security, or orderly operation" of both the prison and the protection of the public. **(# 163-1 at 29)**. Mr. Wilson had a history of violence, including four citations for possession of a dangerous weapon, encouraging others to riot, starting a fire in his cell, and other actions that triggered uses of force prison officers.

On November 2, 2013, before and after lunch was delivered, Mr. Wilson told prison officials that he was experiencing racing thoughts and that he wanted to speak with Dr. Marks, a psychologist with whom he had previously conferred. **(#163-2 at 59; 80-94)**. At the time he had no suicidal thoughts and did not communicate that he was experiencing suicidal thoughts. When staff did not respond with a promise to obtain Dr. Marks, Mr. Wilson inserted his arm in his food slot and help it open in order to get their attention. **(# 163-2 at 93-94)**. He repeatedly demanded to speak to Dr. Marks. **(# 163-2 at 76)**. Holding the food slot open "is a serious violation of BOP security rules."[2] **(# 163-1 at 4-5)**.

---

**(#164)**; Plaintiff's deposition testimony; Officer Morabito's deposition testimony; declarations from Officers Litvan, Wilcox, O'Shaughnessy, Morabito, Navarette, Delgado, Hagans, Terska, Cullison, and Doerer; declarations from Nurse Nehls and BOP Clinical Director David Allred; BOP Health Services documents; documents from Plaintiff's underlying criminal case; and BOP internal policies. **(# 163 and # 167)**.

[2]     The food slot is equipped with a metal box used to pass trays of food to an inmate while ensuring that inmates could not assault staff members by throwing "feces or urine" through the

When Lieutenant Litvan came on duty, prison staff told him that Mr. Wilson was holding open his food slot and covering his cell window. **(# 163-1 at 4-5)**. Lieutenant Litvan approached Mr. Wilson's cell and squatted down by the food slot to talk to him. in order to resolve the situation. **(# 163-1 at 4-5, # 163-2 at 80)**. Mr. Wilson informed Lieutenant Litvan that he had sad feelings about his mother and daughter and that he wanted to speak with someone from the psychology department. Mr. Wilson made no mention of racing thoughts or a need to see Dr. Marks. Indeed, according to his testimony he knew that only an "on-call" psychology staff member would be available at that time. **(# 163-2 at 113)**. Lieutenant Litvan listened to Mr. Wilson, said that he would see what he could do, then left to make some phone calls. **(# 163-2 at 80)**.

When he returned, about 30 minutes later, Lieutenant Litvan informed Mr. Wilson that someone had contacted the Captain who authorized him to remove Mr. Wilson's personal property from his cell.[3] **(# 163-2 at 80, 114-115, # 132 at 6)**. Mr. Wilson knew that before his property could be taken, he would have to "cuff up" so that his door could be opened. **(# 163-2 at 117)**. Mr. Wilson refused, telling Lieutenant Litvan that "you can't do that" in accordance with prison policy and to do so "you still would be violating my rights." **(#163-2 at 120-122)**. Lieutenant Litvan told Mr. Wilson that if he did not allow his property to be taken (necessarily requiring that he "cuff up" and that he allow his cell to be searched), the Captain would authorize a "team", which Mr. Wilson understood to mean a use of force team. **(# 163-2 at 120-22**

---

slot to the other side of the cell door. On this date, Mr. Wilson "extended his arm through the metal box and into the unit, and he refused to pull his arm back" which prevented staff from closing the box without injury to Mr. Wilson and exposed staff to the risk of assault. **(# 163-1 at 6, # 163-2 at 91-96)**.

[3]     At his deposition, Mr. Wilson testified that when prison staff remove an inmate's personal property from a cell, it is usually returned within a few hours or the following day. **(#163-2 at 117)**.

Based on this response, Lieutenant Litvan assumed that Mr. Wilson was unwilling to surrender his personal property which suggested that he had contraband or weapons in his cell that might compromise his safety and the safety and security of the institution. **(# 163-2 at 123, # 163-1 at 6-7)**. Upon Lieutenant Litvan's report of Mr. Wilson's response, the Operations Lieutenant requested authorization to deploy a use of force team to remove Mr. Wilson from his cell. Authorization to conduct a calculated use of force was granted by the Warden. **(# 163-1 at 8, 10-11)**.

While Lieutenant Litvan was gone, Mr. Wilson fashioned body armor from a torn bed sheet and blanket and wrapped them around his upper body to protect himself from any projectiles that might be shot into his cell. **(# 163-2 at 126-128)**. He also donned a second pair of pants and covered his property with a sheet so that his items would not be contaminated with OC spray. **(# 163-2 at 126-128)**. Mr. Wilson also placed his mattress up against the wall so that he could block any munitions from entering his cell. **(# 163-2 at 126-128)**.

The Court now turns to the pertinent facts as to each Defendant's role in the incident.

## A. Lieutenant Litvan

Lieutenant Litvan assembled a use of force team consisting of Lieutenant Wilcox, Lieutenant O'Shaughnessy, Officer Morabito, Officer Navarette, Officer Delgado, Officer Hagans, Officer Cullison, Officer Terska, and Case Manager Doerer (the "team"). **(# 163-1 at 9-11)**. The team arrived at Mr. Wilson's cell at approximately 3:45 p.m. on November 2, 2013.[4] **(# 163-1 at 9-11)**. Lieutenant Litvan briefed the team, informing them that the warden had authorized them to enter Mr. Wilson's cell, subdue him, and move him to another location

---

[4]     At Lieutenant Litvan's direction, Officer Kennemer and Computer Specialist Jordan served as camera operators to film the incident. **(# 163-1 at 9-10)**. The entire incident was recorded on two video recordings, which the Court carefully viewed. **(# 164)**.

should Mr. Wilson continue to refuse orders to submit to restraints. **(# 163-1 at 10-12, # 164, Video Recording, Camera #1, Part 1 at 00:45-2:00)**. Lieutenant Litvan also informed the team of Mr. Wilson's history of violence, citations for possession of a dangerous weapon, encouraging others to riot, starting a fire in his cell, and other uses of force. He warned them that Mr. Wilson might be armed and preparing to assault them. **(# 163-1 at 10-12, # 164, Video Recording, Camera #1, Part 1 at 00:45-2:00)**. Lieutenant Litvan also stated that BOP medical staff had cleared the use of less-than-lethal chemicals to attempt to bring Mr. Wilson under control. **(# 163-1 at 10-12, # 164, Video Recording, Camera #1, Part 1 at 00:45-2:00)**.

Lieutenant Litvan directed Case Manager Doerer to initiate a conversation with Mr. Wilson in an attempt to avoid a confrontation pursuant to BOP policy. **(# 163-1 at 12-13, # 163-11 at 2-3)**. As shown on the video recording, Mr. Doerer asked Mr. Wilson how he was doing, to which he replied, "pretty decent." **(# 164, Video Recording, Camera #1, Part 1 at 09:25-9:52, # 163-11 at 2-3)**. Then, Mr. Doerer advised Mr. Wilson that he needed to submit to hand restraints so that his cell could be searched. **(# 164, Video Recording, Camera #1, Part 1 at 09:25-9:52, # 163-11 at 3)**. Mr. Wilson asked him whether he was from psychology, to which Doerer responded, I'm not, I'm the case manager." **(# 164, Video Recording, Camera #1, Part 1 at 09:25-9:52, # 163-11 at 3)**. Mr. Doerer then stated that it appeared Mr. Wilson had suited up with armor. **(# 164, Video Recording, Camera #1, Part 1 at 09:25-9:52, # 163-11 at 3)**. Mr. Doerer asked Mr. Wilson again if he would submit to hand restraints. Mr. Wilson replied, "no." **(# 164, Video Recording, Camera #1, Part 1 at 09:25-9:52)**.

Lieutenant Litvan ordered Mr. Wilson to submit to hand restraints, to which Mr. Wilson responded, "Y'all got gas? Go ahead and spray it." **(# 164, Video Recording, Camera #1, Part 1 at 10:00-10:13)**. Lieutenant Litvan repeated his request and stated that this was his final order,

and Mr. Wilson replied again, "Go ahead and spray it." **(# 164, Video Recording, Camera #1, Part 1 at 10:00-10:13)**.

Lieutenant Litvan directed that chemical agents be deployed[5] over the course of 12 minutes. **(# 163-1 at 13-14)**. He used "every available less-than-lethal munition in order to attempt to gain Wilson's compliance without physical intervention." **(# 163-1 at 13-15)**. The video shows that during this deployment, Lieutenant Litvan repeatedly ordered Mr. Wilson to submit to hand restraints. **(#164, Video Recording, Camera #1, Part 1 at 10:13-21:54)**. The munitions were ineffective in securing Mr. Wilson's compliance; some were blocked from entering the cell; those that entered the cell did not impact Mr. Wilson. **(# 163-2 at 161-164)**.

Because the chemicals were ineffective in subduing Mr. Wilson, Lieutenant Litvan ordered the team to enter Mr. Wilson's cell to physically secure him. **(# 163-1 at 15-16)**. As seen on the video, the five-man team entered the cell, and it took approximately 13 minutes for the team to turn Mr. Wilson from a prone to a supine position so that his hands could be secured. **(# 163-1 at 15-16, # 164, Video Recording, Camera #1, Part 1 at 21:50-28:30, Part 2 at 0:00-6:17)**. During the struggle, Lieutenant Litvan ordered Mr. Wilson to release his hands and to stop resisting approximately 40 times. **(# 163-1 at 15-16, # 164, Video Recording, Camera #1, Part 1 at 21:50-28:30, Part 2 at 0:00-6:17)**.

At this juncture, there is a sharp dispute as to what transpired. According to Mr. Wilson, the team punched, kneed, and elbowed him while he lay in a prone position. **(# 163-2 at 169)**.

---

[5]     The following munitions were deployed into Mr. Wilson's cell: two bursts of OC spray via a MK-9 aerosol dispenser, two OC vapor grenades, 18 rounds from a pepper ball dispenser, three rounds from a Low Impact Foam Baton, and three bursts of OC spray from an MK-21 dispenser. **(# 163-1 at 14-15)**.

According to the video and declarations of each member of the team, Mr. Wilson was "combative", "resistant", and violent toward the team, punching, kicking, and biting them and knocking off several of the team members' masks during the struggle. Indeed, several of the team members reported sustaining injuries. **(# 164, Video Recording, Camera #1, Part 3 at 2:30-15:00, # 163-3 at 6-7, # 163-4 at 6-7, # 163-5 at 6-7, # 163-6 at 5-7, # 163-7 at 5-6, # 163-8 at 5-6, # 163-9 at 5-6, # 163-10 at 6-7, # 163-11 at 4-5)**.

Eventually, Mr. Wilson held out his hands and allowed the team to apply restraints. Then, the team cut off Mr. Wilson's layers of clothing. Mr. Wilson states that because he was unable to stand, he was dragged out of his cell. **(# 163-2 at 172, 187)**. Mr. Wilson was taken to the decontamination area to wash off any OC spray and then to the medical unit where he was assessed by Health Technician Rogers and treated for his injuries. **(# 163-12 at 18-19)**. Mr. Wilson was issued an incident report associated with this use of force charging him with punching, kicking, and biting the team members. **(# 163-2 at 170)**.

### B. Lieutenant O'Shaughnessy

At Lieutenant Litvan's direction, Lieutenant O'Shaughnessy deployed OC spray via a MK-9 aerosol dispenser, a vapor grenade, multiple rounds from a pepper ball gun, and low impact foam baton rounds via an L-8 launcher into Mr. Wilson's cell. **(# 163-2 at 212-215, # 164, Video Recording, Camera #1, Part 1 at 10:13-21:54).**

### C. Lieutenant Wilcox

At Lieutenant Litvan's direction, Lieutenant Wilcox provided general assistance to Lieutenant O'Shaughnessy while the munitions were deployed. **(# 163-2 at 212-215, # 164, Video Recording, Camera #1, Part 1 at 10:13-21:54).** Lieutenant Wilcox used a "battering ram" to clear the food slot so that the munitions could be deployed into the cell, hitting Mr.

Wilson in the right hip.  **(# 163-2 at 212-215, # 164, Video Recording, Camera #1, Part 1 at 10:13-21:54).**

### D.  Officer Morabito

On November 2, 2013, Officer Morabito was a senior officer assigned to the SMU at USP Florence.  **(# 163-5 at 3)**.  Officer Morabito was tasked with entering the cell first and attempting to secure Mr. Wilson against a wall or on the floor.  **(# 163-5 at 4).**  Mr. Wilson contends that upon the team's entry into his cell, Officer Morabito punched him on the left side of his face, causing injuries.  **(# 163-2 at 177-178)**.  In his deposition, Mr. Wilson also testified that he did not actually see or have personal knowledge that it was Officer Morabito who punched him; a corrections officer told him this.  **(# 163-2 at 180-182)**.  Mr. Wilson's testimony that Officer Morabito struck him is classic hearsay, not competent evidence that can be considered at this juncture.[6]  Fed. R. Evid. 801(c).  Mr. Wilson does not suggest that any exception applies.  Thus, the Court disregards Mr. Wilson's statement that Officer Morabito struck him.

### E.  Officer Navarette

Officer Navarette served as the "second man in line, directly behind Officer Morabito." **(# 163-6 at 5)**.  Mr. Wilson contends that Officer Navarette punched him while he was laying on the ground.  **(# 163-2 at 199-201)**.  However, Mr. Wilson testified that he has no personal knowledge that Officer Navarette punched him; rather an unknown corrections officer told him so.  **(# 163-2 at 200-212)**.  As with the similar statement with regard to Officer Morabito, the Court does not consider Mr. Wilson's statement that Officer Navarette struck him.

---

[6]  Hearsay statements do not demonstrate a genuine issue of fact sufficient to deny summary judgment. *Johnson v. Weld County*, 594 F.3d 1202, 1210 (10th Cir. 2010).

However, it is undisputed that, after struggling with Mr. Wilson on the floor of his cell for approximately 13 minutes, Officer Navarette kneed Mr. Wilson in the upper torso or neck area in an effort to roll him over to a supine position so that hand restraints could be applied. **(#163-2 at 201-203, # 163-6 at 6).**  As a result, Mr. Wilson sustained a stiff neck.  **(# 163-2 at 201-203, # 163-6 at 6).**  Once Mr. Wilson was restrained, Officer Navarette and the other team members removed him from the cell.  **(# 163-6 at 7-8).**  Mr. Wilson does not complain of any other conduct by Officer Navarette.

### F.  Officer Delgado

Mr. Wilson states that Officer Delgado punched him because Officer Delgado was "helping his co-workers … gain control of the situation."  **(#163-2 at 195).**  However, Mr. Wilson does not specifically remember Officer Delgado striking him and complains of no further conduct by Officer Delgado.  **(# 163-2 at 196)**.

### G.  Officer Hagans

Officer Hagans was responsible for "maintaining control of the inmate's lower appendage to [his] right-hand side."  **(# 163-8 at 3-4)**.  Mr. Wilson states that Officer Hagans twisted his ankle during the struggle in the cell and then kneed him on the left side of his face once he was removed from his cell.  However, Mr. Wilson has no personal knowledge of Officer Hagan's conduct, instead he learned about it from Officer Hagans' brother.  **(# 163-2 at 185-189)**.  As with the statements of conduct by Officers Morabito and Navarette, the statement about Officer Hagans alleged conduct is hearsay, and thus the Court disregards it.

### H.  Officer Terska

Officer Terska was responsible for restraining Mr. Wilson's lower left appendage.  **(#163-9 at 4)**.  Mr. Wilson states that he saw Officer Terska inside the cell but does not have any

specific recollection as to his conduct.  **(# 163-2 at 205-208)**.

### I.  Officer Cullison

Officer Cullison, served as the "equipment and key operator."  **(# 163-10 at 4-5)**.  During the struggle in the cell, Officer Cullison used trauma shears to cut away Mr. Wilson's clothing in order to search for possible weapons.  **(# 163-10 at 6-7)**.  Mr. Wilson has no recollection of any assaultive conduct by Officer Cullison during the incident.  **(# 163-2 at 210)**.

### J.  Nurse Nehls

During the relevant time period, Nurse Nehls was a nurse practitioner at USP Florence assigned to treat inmates housed in the SMU.  **(# 163-12 at 2-3)**.  On November 4, 2013, Mr. Wilson stopped Nurse Nehls during her daily rounds and requested a medical assessment and pain medication.[7]  The November 4, 2013 medical note reflects that Nurse Nehls examined Mr. Wilson's eye, and she observed "ecchymosis and swelling to the orbital area", but that Mr. Wilson could "see without difficulty."  **(# 163-12 at 5)**.  She informed him that he could "put in a cop-out if he had any further issues."  **(# 163-12 at 5)**.

On November 5, 2013, Mr. Wilson submitted a written request to be "seen by medical and treated" and requested color photos be taken of his injuries.  **(# 163-2 at 224, 242-243,  # 163-12 at 16)**.  On November 7, 2013, Nurse Nehls responded to Mr. Wilson stating that he was "assessed and photographed during the use of force."  **(# 163-12 at 16)**.

---

[7]      In her declaration, Nurse Nehls states that when an inmate approaches her with an issue during her daily rounds, it is her practice to conduct a medical assessment to see if the inmate has any issues needing immediate attention.  She bases this assessment on both the inmate's reported symptoms and her own clinical observations.  If immediate care is necessary, she would either treat the inmate herself or ensure that another provider would provide treatment on an expedited basis.  If she determined that immediate care was not required, Nurse Nehls would direct the inmate to submit a sick-call request, describing the medical issue so that he could be placed on a list to see a provider.  Nurse Nehls followed this practice on November 4, 2013 when Mr. Wilson approached her.  **(# 163-12 at 4-5)**.

On November 8, 2013, Mr. Wilson submitted a sick call request asking why his requests for pain medication had been denied. **(# 163-2 at 224-226, 242-243, # 163-12 at 21)**. On November 12, 2013, Nurse Nehls responded "[i]t is available for you via other options other than pharmacy."[8] **(# 163-12 at 21)**.

On November 10, 2013, Mr. Wilson submitted a written request asking to have his jaw x-rayed and complained of pressure in his ear when he bit or chewed. **(# 163-2 at 224, 242-243, # 163-12 at 29)**. On November 13, 2013, Nurse Nehls responded "you are already on the list to be seen again. If you continue to request the same thing, the new effective date will be the current date your cop-out is processed." **(# 163-12 at 29)**. On November 12, 2013, Mr. Wilson submitted an essentially identical request to have his jaw x-rayed and for pain medication, to which Nurse Nehls responded that he was on the list to be seen by a provider and that he did not "meet the criteria for medical to provide pain medication." **(# 163-12 at 30)**. In the days following the use of force, while Mr. Wilson informed Nurse Nehls about his injuries to his jaw and right eye, he could not remember whether he told her that he was in severe pain. **(# 163-2 at 242-243)**.

**This Action**

The operative pleading in this case is Mr. Wilson's Second Amended Complaint **(# 132)**, setting forth six claims under 42 U.S.C. § 1983, all in violation of the Eighth Amendment. The Court previously dismissed all claims except Mr. Wilson's excessive force claims against Lieutenant Litvan, Lieutenant Wilcox, Lieutenant O'Shaughnessy, Officer Navarette, Officer Morabito, Officer Hagans, Officer Cullison, Officer Delgado, and Officer Terska (Claims 1 and

---

[8]     According to the BOP Program Statement, inmates may purchase over-the-counter medications such as Acetaminophen or Aspirin from the Commissary. **(# 163-12 at 23)**.

2) and his deliberate indifference claim asserted against Nurse Nehls (Claim 4).[9] **(# 143, # 148)**. The Defendants seek summary judgment on all three claims contending that Mr. Wilson has not made a prima facie showing that the alleged actions constitute an Eighth Amendment violation.

## LEGAL STANDARDS

### A. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

---

[9]     Specifically, Mr. Wilson alleged the following causes of action: (1) use of excessive force prior to Mr. Wilson's restraint against Defendants Wilcox, Litvan, O'Shaughnessy, Navarette, Morabito, Hagans, Cullison, Delgado, Terska, Klein, and Swartz; (2) use of excessive force after Mr. Wilson's restraint against Defendants Wilcox, Litvan, O'Shaughnessy, Navarette, Morabito, Hagans, Cullison, Delgado, Terska, Klein, and Swartz; (3) deliberate indifference to Mr. Wilson's mental health needs against all individual defendants; (4) indifference to medical needs against Defendants Rogers and Nehls; (5) creation of an environment in which excessive physical force was likely to occur against Defendants Klein and Swartz; and (6) creation of an environment in which medical neglect was likely to occur against Defendants Klein and Swartz. **(# 132)**. The Court dismissed Claim 1 against Defendants Klein and Swartz and estopped Mr. Wilson from asserting or presenting evidence inconsistent with the findings made by the disciplinary hearing as to his conduct in the subject incident. The Court further dismissed Claim 4 without prejudice as to Defendant Rogers and Claims 3, 5, and 6 without prejudice. **(# 143)**.

motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B. Qualified Immunity**

Each Defendant asserts the defense of qualified immunity, arguing that Mr. Wilson cannot show that each of the BOP officials violated his clearly established constitutional rights. Qualified immunity protects individual state actors from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  When that defense is raised, the burden is upon the plaintiff to show: (i) a violation of a constitutional right, and (ii) that the contours of that right were "clearly established" by existing Supreme Court or 10th Circuit precedent (or the weight of authority from other circuits) at the time of the events herein. *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017).

For all practical purposes, the first prong of the analysis - whether the evidence shows a violation of a constitutional right -  is indistinguishable from the inquiry that the Court would make in determining whether the plaintiff has come forward with sufficient evidence to establish a *prima facie* claim in accordance with Rule 56.  The plaintiff must produce sufficient evidence, which if true, would make a *prima facie* showing of a cognizable claim.  The Court considers the evidence in the light most favorable to the plaintiff and assesses whether it is sufficient to demonstrate the violation of a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The second prong in the qualified immunity analysis focuses upon whether the Plaintiff's right was "clearly established" at the time it was violated.   This requires that there was existing precedent, at the time of the challenged events, that recognized a constitutional violation in similar circumstances.  Courts must conduct the "clearly established" analysis at a "high degree of specificity," rather than in generalities.  *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018).  However, the specificity requirement is not so exacting that "the very action in question [must have] previously been held unlawful."  *Ziglar v. Abassi*, 137 S.Ct. 1843, 1866, 198 L.Ed.2d 290 (2017).

A court may begin its analysis by focusing on either prong.  In this case, the Court begins with the first – was there a constitutional violation?

## ANALYSIS

### A. Excessive Force

The Defendants contend that Mr. Wilson cannot make a prima facie showing of the use of excessive force. Thus, the Court focuses on whether Mr. Wilson has made a *prima facie* evidentiary showing . If not, the Court need not reach the second prong of the qualified immunity analysis.

An Eighth Amendment excessive force claim requires proof that satisfies two prongs: (1) there must be alleged wrongdoing that is objectively harmful enough to establish a constitutional violation, and (2) the actor must have acted with culpable state of mind." *Redmond v. Crowther*, 882 F.3d 927, 936 (10th Cir. 2018) (internal quotation marks omitted).

For the first prong, a prisoner need not show a "significant injury" . *Graham v. Sherriff of Logan County*, 741 F.3d 1118, 1123 (10th Cir. 2013) (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)). Rather, this inquiry focuses on the "nature of the force" that was used. However, in determining the nature and degree of force used, a court may consider any resulting injuries. *Id.*

As to the second prong, an official has a culpable state of mind if he uses force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Redmond v. Crowther*, 882 F.3d at 937. To determine whether prison officials applied force maliciously and sadistically or, rather, in good faith, courts may consider (1) the need for the force, and (2) whether the officers used a disproportionate amount of force. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986). Caselaw in the Tenth Circuit recognizes that "a prison guard, to maintain control of inmates, must often make instantaneous, on-the-spot decisions concerning the need to apply force without having to second-guess himself." *Sampley v. Ruettgers*, 704 F.2d 491, 496 (10th Cir. 1983). Thus, as to the subjective

component, "review of a claim of the use of excessive force in a prison is to be deferential to the prison." *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997). When prison officials act to preserve internal order and discipline, they are afforded wide-ranging deference. *Redmond*, 882 F.3d at 938. Such deference does not, however, insulate actions taken in bad faith and for no legitimate purpose from review or allow courts to "freely substitute their judgment for that of officials who have made a considered choice." *Id.*

### Claims 1 and 2

The Court understands Claim 1 and Claim 2 to pertain to (1) the deployment of chemical agents into Mr. Wilson's cell; (2) the team's entry into the cell to apply restraints; and (3) the team's removal of Mr. Wilson from the cell following the application of restraints. The Defendants challenge Mr. Wilson's ability to make a *prima facie* showing that 1) the force used under the circumstances was objectively harmful enough to violate the Constitution; and that 2) the force was applied maliciously and sadistically for the purpose of causing harm. To some degree, the Defendants conflate the two elements. The Court understands that their primary argument is that the force was used to restore order and prevent harm to prison staff **(# 163),** which goes to whether the Defendants applied the force maliciously or sadistically.

For purposes of analysis, therefore, the Court will assume, without deciding, that the force used – chemicals dispersed through use of munitions and physical force in restraining and removing Mr. Wilson from his cell was objectively sufficient to cause harm. Thus, the focus of the following discussion is on the evidence pertinent to the second analytical prong – did the officer act with culpable intent.

a. **Lieutenant Litvan**

**Use of Chemicals**

Lieutenant Litvan determined that Mr. Wilson violated a BOP rule by holding open his food slot, and refusing to submit to a cell search or hand restraints despite many requests that he do so. **(# 163-2 at 76, # 164, Video Recording, Camera #1, Part 1 at 09:25-21:54)**. Lieutenant Litvan repeatedly attempted to obtain Mr. Wilson's voluntary cooperation, and when such efforts proved fruitless, he decided that the only way to remove Mr. Wilson from his cell was by using physical force. He cleared the use of force, particularly use of chemical agents, with the Warden and medical team who considered Mr. Wilson's medical history and he assembled the use of force. Before employing the chemicals, Lieutenant Litvan again directed Mr. Wilson to submit to handcuffs, and when Mr. Wilson refused, Lieutenant Litvan directed that chemical agents be deployed into Mr. Wilson's cell. This continued for a period of 12 minutes. **(# 163-1 at 13-14).** When it became clear that Mr. Wilson still would not submit to handcuffs, Lieutenant Litvan directed the use of chemicals to cease. **(#164, Video Recording, Camera #1, Part 1 at 09:25-21:54)**. [10]

There is no argument that the chemicals were not needed, for even after they were used, Mr. Wilson refused to submit to handcuffs. So, the question becomes whether the force used was disproportionate to the amount needed. The evidence does not suggest that it was.

First, Lieutenant Litvan conformed to BOP's procedures. BOP Program Statement P5566.06, 28 C.F.R. § 552.20-23[11] permits personnel to use force "[w]hen authorized"

---

[10]     The Court notes that Mr. Wilson admits that he was not injured by the chemical agents. **(# 163-2 at 161-163)**.
[11]     Such regulations, while not dispositive of the question, are instructive because use of force outside these provisions might reasonably be considered "excessive".

reasonably necessary "to gain control of the inmate, to protect and ensure the safety of inmates, staff, and others, to prevent serious property damage, and to ensure institution security and good order." **(# 163-1 at 43, Program Statement P5566.06, Use of Force and Application of Restraints (November 30, 2005)).** It further authorizes the use of chemical agents or non-lethal weapons only when an inmate is "armed or barricaded" or "[c]annot be approached without danger to self or others" and "a delay in bringing the situation under control would constitute a serious hazard to the inmate or others." Finally, prior to a calculated use of force, the inmate's medical file must be reviewed to determine whether the inmate has any medical conditions that could be adversely affected by the use of chemical agents or other non-lethal weapons. **(# 163-1 at 58, Program Statement P5566.06).** 28 C.F.R. § 552.25 also provides that use of such force is permitted when the inmate "cannot be approached without danger to self or others."

There is no dispute that the Lieutenant Litvan's purpose was to "gain control" of Mr. Wilson after Mr. Wilson repeatedly refused to surrender himself to handcuffing. Lieutenant Litvan was particularly concerned about Mr. Wilson's prior history of violent behavior in the prison setting coupled with the fact that he had "suited up" by donning extra blankets and clothing as a sort of body armor and placed his mattress up against the wall to use as a barricade. No force was used until Lieutenant Litvan obtained authorization and medical staff reviewed Mr. Wilson's medical records. Lieutenant Litvan made multiple attempts to avoid confrontation before using force and ceased using the approved force when it did not accomplish the objective of controlling Mr. Wilson. Thus, it appears from the record that Lieutenant Litvan complied with all of the requirements of BOP policy before employing chemical agents. By itself, this would appear to be inconsistent with subjective malice or wanton use of force. *See Gargan v. Gabriel*, 50 Fed. Appx. 920, 923 (10th Cir. 2002) (spraying 4 cans of pepper spray into an inmate's cell

does not give rise to an inference that it was used excessively or wantonly).

Second, Mr. Wilson offers no evidence to suggest that Lieutenant Litvan harbored ill will or personal animus towards him, or that some lesser use of force would have resulted in Mr. Wilson complying with orders to "cuff up". To the contrary, Mr. Wilson speaks to his good relationship with Lieutenant Litvan. **(# 163-2 at 105)**

Based on the record, therefore, the Court finds that no reasonable jury could find that Lieutenant Litvan had culpable intent when deciding to use force, assembling the force team or deploying chemical agents into Mr. Wilson's cell.

**Entry into Mr. Wilson's Cell**

Once it became apparent that the use of munitions was not working, Lieutenant Litvan directed the team to enter Mr. Wilson's cell, physically subdue him and apply hand restraints. Lieutenant Litvan watched as the team entered the cell, physically struggled with Mr. Wilson in an attempt to apply the restraints, and during the course of action repeatedly directed Mr. Wilson to give up his hands and voluntarily cooperate. Again, the Court will assume, but not decide, that the force that Lieutenant Litvan directed the team to use was objectively harmful. But there is insufficient evidence to show that Lieutenant Litvan acted with a culpable state of mind or with purposeful intent to harm Mr. Wilson.

Program Statement P5566.06 permits staff to "use only that amount of force necessary to gain control of the inmate", which includes the use of physical restraints as "necessary to gain control of [a violent or destructive] inmate." § 552.20. Additionally, the regulations state that prison staff should first attempt to obtain the inmate's voluntary cooperation before resorting to force, force may not be used to punish, and only the amount of force necessary to obtain control of the inmate is permitted. Also, confrontation avoidance techniques should be employed before

force is used.  §§ 552.20-23.

Lieutenant Litvan's conduct at this stage was also consistent with BOP regulations.  Mr. Wilson's refusal to comply after the chemicals were deployed is evidence of his refusal to cooperate with orders given to him.  The next step, after the chemicals failed, was an effort to physically subdue Mr. Wilson, and before and throughout the process, Lieutenant Litvan repeatedly and consistently asked for Mr. Wilson's cooperation.

Mr. Wilson contends that various team members punched, kicked, and kneed him during the struggle in the cell, and that Lieutenant Litvan should be held responsible for their actions. Ordinarily, there is no supervisory liability as to Lieutenant Litvan under §1983 based solely on the actions of one's subordinates.[12]  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Rather, Lieutenant Litvan must  act or knowingly refuse to act in order to be held accountable for the actions of the team.  Mr. Wilson has come forward with no evidence that Lieutenant Litvan directed the team members to punch, kick or knee Mr. Wilson, nor that he witnessed them doing so and failed to intervene.  **(# 163-2 at 217, # 164, Video Recording, Camera #1, Part 1 at 21:50-28:30, Part 2 at 0:00-6:17, Part 3 at 2:30-15:00)**.  Even construing the evidence most favorably to Mr. Wilson, there is significant

---

[12]     A prison official like Lieutenant Litvan may be sued in two different capacities – individual and official.  As an individual, he can have either personal or supervisory liability. Personal liability under § 1983 must be based on personal involvement in the alleged constitutional violation.  *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997).  This evidence may include: "the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  *Serna v. Colorado Dep't of Corrections*, 455 F.3d 1146, 1152-1153 (10th Cir. 2006) (internal citations omitted).  Supervisory liability arises when a defendant-supervisor "creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).  As set forth in this Opinion, Lieutenant Litvan cannot be held liable as a supervisor when there is insufficient evidence of an underlying deprivation of a constitutional right.  *Id.*, *see Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

confusion as to what occurred because he has no recollection of whether or who struck him. **(# 163-2 at 180-189, 196, 200-212)**.

In the absence of showing an act or purposeful inaction by Lieutenant Litvan, the first element of proof required by Mr. Wilson is not satisfied, but even if it were, there is insufficient evidence to show malicious intent to inflict harm. As noted earlier, the record does not show ill will, antagonism or maliciousness on the part of Lieutenant Litvan. **(# 163-2 at 215-216)**. Thus, no reasonable jury could find that Lieutenant Litvan used excessive force in subduing Mr. Wilson or removing him from his cell.

In the absence of a *prima facie* showing that Lieutenant Litvan used excessive force at any point before or during the incident, no constitutional violation can be shown. He is entitled to qualified immunity.

### b. Lieutenant O'Shaughnessy

Mr. Wilson's showing with regard to Lieutenant O'Shaughnessy is essentially the same as that made with regard to Lieutenant Litvan, Lieutenant O'Shaughnessy was acting at Lieutenant Litvan's direction; there is no suggestion in the record that Lieutenant O'Shaughnessy was authorized to or made any independent assessment of the propriety of the use of munitions or OC spray or that he did so. Thus, the Court need not specifically address the decision to use OC spray or munitions.

To the extent that Mr. Wilson contends that the "amount" of OC spray was excessive **(# 263-2 at 215)**, the record contains no evidence that (1) Lieutenant O'Shaughnessy determined the quantity of OC spray to be deployed or 2) shows what quantity was appropriate and that such quantity was less than that used. As noted, the Warden and BOP medical staff approved the use of the munitions. Finally, Lieutenant O'Shaughnessy immediately ceased deployment of the

chemicals and munitions at Lieutenant Litvan's direction. **(# 163-4)**. There is no showing that cessation should have occurred earlier. Accordingly, the evidence proffered is insufficient to establish the first element of an excessive force claim against Lieutenant O'Shaughnessy based on use of "an excessive amount of OC spray". However, were the Court to do so, it would find lack of sufficient evidence of a culpable state of mind. As with Lieutenant Litvan, there is no evidence of animus, hard feelings, or other sentiment that would have led Lieutenant O'Shaughnessy to deploy the chemicals. **(# 163-2 at 212-213)**. Accordingly, no constitutional violation has been shown, and Lieutenant O'Shaughnessy is entitled to qualified immunity.

### c. Lieutenant Wilcox

Lieutenant Wilcox assisted Lieutenant O'Shaughnessy with the deployment of the chemicals. At Lieutenant Litvan's direction, Lieutenant Wilcox used a "battering ram" to clear the food slot so that the munitions could be deployed into the cell. This resulted in hitting Mr. Wilson in the right hip. **(# 163-2 at 212-215, # 164, Video Recording, Camera #1, Part 1 at 10:13-21:54).**

As with Lieutenant O'Shaughnessy, Lieutenant Wilcox acted at the direction of Lieutenant Litvan. There is no suggestion that Lieutenant Wilcox was authorized to nor that he decided to clear the food slot with the battering ram on his own initiative. It would appear that clearing the food slot was necessary to use the chemical agents, and there is no showing that the chemicals could have been dispersed otherwise. There is no evidence that the food slot could have been cleared by any means other than use of the battering ram. Finally, there is no showing that in clearing the food slot that Lieutenant Wilcox used the battering ram with the subjective purpose of injuring Mr. Wilson.[13] On this record, Mr. Wilson has not made a prima facie

---

[13]     Mr. Wilson gave no indication that the battering ram injured him. **(# 163-2 at 159-161)**.

showing of an excessive force claim against Lieutenant Wilcox, and thus he is entitled to qualified immunity.

### d. Officer Morabito, Officer Delgado, and Officer Hagans

These officers all entered Mr. Wilson's cell as part of the use of force team. Mr. Wilson contends that each physically injured him. He believes that Officer Morabito punched him on the left side of his face, that Officer Delgado hit him, and that Officer Hagans twisted his ankle during the struggle in the cell and kneed him after he was removed from the cell. Mr. Wilson's beliefs, however, are not supported by competent evidence. He has no recollection of the events and relies entirely on hearsay from unidentified witnesses. **(# 163-2 at 180-189, 196, 200-212)**. As a consequence, no reasonable jury could conclude that these Defendants engaged in an excessive use of force, and thus they are entitled to qualified immunity.

### e. Officer Navarette

The claim against Officer Navarette has two facets. First, Mr. Wilson believes that while he was on his stomach, Officer Navarette punched him while he lay on the ground. Like the contentions against Officers Morabito, Delgado and Hagans, Mr. Wilson has no personal knowledge that Officer Navarette punched him. Instead, he relies upon hearsay from an unidentified person. **(# 163-2 at 180-182)**. Mr. Wilson's belief is not competent evidence to prove a claim for this action.

Second, it is undisputed that during the struggle to apply restraints to Mr. Wilson, Officer Navarette kneed Mr. Wilson in an attempt to roll him over so that the team could access his hands. As a result, Mr. Wilson contends he suffered a stiff neck. **(# 163-2 at 201-203, # 163-6 at 6).**

The Court will assume, without deciding, that Officer Navarette's conduct in kneeing Mr.

Wilson would be an objectively harmful use of force. Thus, the question is whether such action was done with a culpable state of mind for the purpose of causing harm. *See Hudson*, 503 U.S. at 6 (stating that a plaintiff must show that the officers applied force "maliciously and sadistically for the very purpose of causing harm."). Even construing the evidence in the record most favorably to Mr. Wilson, it is inadequate to make this showing.

The general need for force to subdue Mr. Wilson has been discussed earlier.[14] But, even if force was necessary, there is a second level of inquiry as to whether this particular use of force was appropriate and applied without malice. Both before and after the team entered Mr. Wilson's cell, he refused to submit to hand restraints. Despite Lieutenant Litvan's repeated orders to present his hands, Mr. Wilson laid in a prone position with his hands underneath him in order to make them unreachable by the officers. Officer Navarette could not see Mr. Wilson's hands and feared that he was concealing a weapon. **(# 163-6 at 6)**. The struggle to restrain Mr. Wilson's hands lasted for more than 13 minutes. **(# 164, Video Recording, Camera #1, Part 1 at 21:50-28:30, Part 2 at 0:00-6:17).** At that point, Officer Navarette testified that he observed the team was exhausted and struggling to breathe through their gas masks, but Mr. Wilson was not flagging. So, Officer Navarette pressed his knee into Mr. Wilson's torso "in an effort to force him to roll over, so that we could secure his hands." **(#163-6 at 6)**[15]. Shortly after Officer Navarette applied his knee, the team was able to turn Mr. Wilson onto his back and secure his hands. **(# 163-6 at 6-7)**.

_____

[14]   It is undisputed that team had been advised of Mr. Wilson's violent history, including being cited for the possession of weapons. It is also undisputed that Mr. Wilson appeared to be wearing body armor when the team arrived at his cell. **(# 163-6)**.

[15]   Mr. Wilson sustained relatively minor injuries from the kneeing. And, while he complains of a stiff neck, Mr. Wilson does not explain how Officer Navarette's application of his knee to Mr. Wilson's upper torso caused such an injury. **(# 163-2 at 200-205)**.

Based on this evidence, it appears that reaching Mr. Wilson's hands required some use of force to roll him from a prone to supine position, and that Officer Navarette's "kneeing" of Mr. Wilson accomplished the objective. There is no evidence that such action was accompanied by any culpable state of mind, that the kneeing was prolonged or repeated or that any significant injury resulted. Indeed, although Officer Navarette was injured in the fracas, there is no suggestion that his action was retaliatory. **(# 163-6 at 5-8)**. Thus, on this the record the Court cannot find the force used by Officer Navarette was accompanied by culpable intent to injure or harm Mr. Wilson. Officer Navarette is entitled to qualified immunity.

### f. Officers Terska and Cullison

Officer Terska and Officer Cullison were both members of the team that entered Mr. Wilson's cell. However, Mr. Wilson cannot identify any use of force by these two officers. **(#163-2 at 205-208)**. Thus, they are entitled to qualified immunity.

### B. Deliberate Indifference to a Serious Medical Need Claim

Claim 4 asserts that Nurse Nehls refused to medically examine Mr. Wilson's injuries or give him pain medication in violation of his rights under the Eighth Amendment. Nurse Nehls moves for summary judgment on this claim arguing that Mr. Wilson cannot make a prima facie showing of deliberate indifference to a serious medical need and asserts the defense of qualified immunity.

It is well established that if prison officials are deliberately indifferent to a prisoner's serious medical needs such conduct constitutes the unnecessary and wanton infliction of pain and thus violates the prisoner's Eighth Amendment rights. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To make a *prima facie* showing that Nurse Nehls violated the Eighth Amendment, Mr. Wilson must come forward with evidence that, viewed most favorably to him, would (1)

objectively prove the existence of a "serious" medical need and that (2) subjectively, prove that Nurse Nehls was aware that the serious medical need posed a substantial risk to Mr. Wilson's health or safety and notwithstanding such knowledge was deliberately indifferent to it. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).

A medical need is considered "sufficiently serious" if the condition "has been diagnosed by a physician as mandating treatment or ... is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999) (citations and quotation marks omitted). Deliberate indifference does not require a showing of express intent to harm Mr. Wilson, only that the official acted, failed to act or delayed action such as treatment, referral or examination despite her knowledge of a substantial risk of serious harm. *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005); *see also Farmer v. Brennan*, 511 U.S. 825, 836 (1994). In regard to the objective element, a delay in medical care "only constitutes an [Eighth] Amendment violation where the plaintiff can show that the delay resulted in substantial harm," but such harm may be shown by proof that "considerable pain resulted from the delay." *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000).

Nurse Nehls contends that the evidence is insufficient to establish either element of the claim. The Court begins with the objective element – whether the evidence shows that Mr. Wilson had a serious medical need following his extrication from his cell.

The record shows that Mr. Wilson received a Post-Use-of-Force Medical Assessment by Health Technician Rogers immediately following the incident. **(# 163-2 at 218, # 163-13 at 15-16)**. Mr. Rogers observed that Mr. Wilson did not appear to be in any immediate pain or distress and noted that Mr. Wilson's only injuries were contusions behind his left ear and on his forehead

and an abrasion on the back of his left hand. **(# 163-13 at 15-16)**. The Assessment notes no need for specific treatment, but Mr. Wilson could follow up at sick call as well as during medical staff's daily rounds. **(# 163-13 at 15-16)**. These findings are insufficient to demonstrate a serious medical need that mandated treatment immediately following the incident. *See Hunt*, 199 F.3d at 1224

Thereafter, on November 4, 2013, Nurse Nehls examined Mr. Wilson's injuries during her daily rounds. Nurse Nehls found no condition in need of emergent care or prescription pain medication. **(# 163-12 at 5)**. Nurse Nehls examined Mr. Wilson's injuries, considered his complaints, and found, based on her medical judgment, they did not constitute an obvious medical emergency and, pursuant to BOP policy,[16] placed him on a list to see a medical provider. **(# 163-12 at 5)**. The medical records at this juncture do not reflect any serious medical condition. **(# 163-12 at 14)**.

Mr. Wilson appears to argue that he had a serious medical need because he experienced pain. Indeed, pain can constitute a serious medical need, both because it can be a symptom of a serious underlying medical condition and because severe pain should be treated by prison officials.[17] Thus, the question becomes whether Mr. Wilson was suffering from severe pain that

---

[16]     Nurse Nehls submits the declaration of David Allred, a BOP Clinical Director at the Federal Correctional Institution located in Herlong, California. Mr. Allred was previously employed as the Clinical Director at USP Florence and was Nurse Nehls' supervisor during the relevant events implicated in this case. **(# 163-13)**. Mr. Allred stated that Nurse Nehls acted pursuant to policy and provided Mr. Wilson appropriate medical care following the use of force. **(# 163-13)**.

[17]     *See Mata v. Saiz*, 427 F.3d , 745, 754 (10th[h] Cir. 2005) (holding that severe chest pain suffered for several days as the result of a delay in treatment is a sufficiently serious medical need to satisfy the objective prong); *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) (determining that severe chest pain lasting several hours, a symptom consistent with a heart attack, is a serious medical condition under the objective prong of the Eighth Amendment's deliberate indifference standard); *Al-Turki v. Robinson*, 762 F.3d 1188, (10th Cir. 2014) (finding that untreated severe pain causing collapse, vomiting, and fear of death lasting for several hours

should have been addressed by Nurse Nehls rather than placing him on a list to see a medical provider.

There is no evidence in the record showing that Mr. Wilson communicated to Nurse Nehls that he was experiencing severe pain. Mr. Wilson admitted he could not recall whether he ever advised Nurse Nehls that his pain was "severe". **(# 163-2 at 242)**. Further, the medical records do not indicate any complaints of severe pain by Mr. Wilson, and Nurse Nehls' written responses likewise contain no such references. **(# 163-12 at 14-22, 29-32)**. Thus, because Mr. Wilson cannot show that Nurse Nehls was aware he was experiencing severe pain, Nurse Nehls had no obligation to provide prescriptive medication for pain or immediate medical assessment. Essentially, Mr. Wilson disagreed with the medical care provided by Nurse Nehls, but it is long established that a prisoner's disagreement with the medical care provided does not give rise to a constitutional violation. *See Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 811 (10th Cir. 1999)

In the absence of sufficient evidence to show a constitutional violation, Nurse Nehls is entitled to qualified immunity.

## C. Motions to Restrict Access

The Defendants and the Plaintiff each move to restrict public access to several exhibits filed in support of the summary judgment briefing pursuant to D.C. Colo. L. Civ. R. 7.2.

---

is a serious medical need); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278-79 (10th Cir. 2001) (holding that twelve hours of debilitating pain accompanied by severe vomiting and "considerable pain [experienced] while [a] finger continued to rot" constituted substantial harm); *Kikumura v. Osagie*, 461 F.3d 1269 (10th Cir. 2006) (finding "torturous" pain lasting 12 hours along with vomiting and mental distress constituted substantial harm); *Perotti v. Serbi*, 786 Fed. Appx. 809 (10th Cir. 2019) (finding that substantial pain lasting five days constitutes substantial harm); *but see Beers v. Ballard*, 248 Fed. Appx. 988, (10th Cir. 2007) (finding that complaints of pain with no indication of the nature or severity did not constitute substantial harm).

"Courts have long recognized a common-law right of access to judicial records." *United States v. Bacon*, 950 F.3d 1286, 1292 (10th Cir. 2020) (citing *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012)). "Although this common law right is not absolute, there is a strong presumption in favor of public access." *Id.* The strong presumption of openness can "be overcome where countervailing interests heavily outweigh the public interests in access" to the judicial record. Thus, in exercising their discretion to restrict access to judicial records, courts must "weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Id.*

Motions seeking restriction of public records must articulate a sufficiently significant interest that will justify continuing to override the presumption of public access and must demonstrate that no remedy short of restricted access can adequately protect the identified privacy interests. *Id.* D.C. Colo. L. Civ. R. 7.2. specifically requires that a motion to restrict public access must describe: (1) the nature of the materials or proceedings at issue; (2) the legitimate private or public interests that warrant the relief sought; (3) the clearly defined and serious injury that would result if the relief sought is not granted; (4) why a less restrictive alternative to the relief sought is not available; and (5) identify the level of restriction sought. With those considerations in mind, the Court briefly addresses each motion.

The Defendants move **(# 165)** to restrict public access to the two video recordings of the incident involving Mr. Wilson on a CD filed at Docket # 164. In these recordings, Mr. Wilson is depicted in various states of undress. The Court has some questions as to whether the Defendants can base a motion to restrict access by asserting privacy interests on behalf of the Plaintiff. However, assuming that they can, the Court nevertheless must deny the motion.

The two video recordings form the evidentiary foundation for much of the Court's ruling. They show contemporaneously recorded information about the incident with greater specificity than any other evidence in the record. The public interest in being able to review this evidence is critical to understanding the ruling and such interest outweighs Mr. Wilson's modesty. It is he who brought this action, and presumably he knew or learned that the videos might be pertinent to its determination. He has not objected to the Court's consideration of the videos. Thus, his privacy interest is outweighed by the public's right to open records.

Mr. Wilson moves to restrict public access to two deposition transcripts that were attached to a response mistakenly filed in this case. **(# 166-1 and #166-2)**. Plaintiff's counsel filed the wrong response at Docket # 166 but then filed the correct response at Docket # 167. There is no particular public interest in documents that were filed in error and not considered by the Court. *See Riker v. Federal Bureau of Prisons*, 315 Fed. Appx. 752, 754 (10th Cir. 2009). Thus, the Court grants the motion insofar as it seeks to restrict to level 1 access the exhibits filed at Docket # 166-1 and Docket # 166-2.

Mr. Wilson also moves to restrict public access to a deposition transcript that was attached as an exhibit to his Amended Response **(# 167-2)**. In the motion, he fails to identify specific interests are implicated, the resulting injury that would occur if the transcript were made public, nor why restriction that is appropriate. Thus, the Court denies the motion to restrict as to the exhibit filed at Docket # 167-2.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment **(# 163) is GRANTED**.  All of the Defendants are entitled to qualified immunity  and thus the claims against them are **DISMISSED, with prejudice**.  The Clerk of the Court shall close this case.

The Defendants' motion to restrict access **(# 165)** is **DENIED** and the Clerk of the Court shall lift all access restrictions for Docket # 164.

Plaintiff's motion to restrict access **(# 168)** is **GRANTED IN PART AND DENIED IN PART** in that the Clerk of the Court shall lift all access restrictions on Docket # 167-2 but access to Docket # 166-1 and 166-2 will remain subject to restriction

Dated this 24th day of March, 2020.

BY THE COURT:

_Marcia S. Krieger_
_____

Marcia S. Krieger
Senior United States District Judge